IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SHERRY NELLIE REDFORD | * |
| | * |
| v. | *  Civil No. JFM-03-626 |
| | * |
| SC JOHNSON & SON, INC., et al. | * |
| . | * |
| | ***** |

OPINION

Defendant SC Johnson & Son, Inc. ("SC Johnson") manufactures Glade PlugIn ("GPI") air fresheners. Plaintiff Sherry N. Redford's ("Redford") home caught fire and was damaged severely on November 17, 2001, an accident she claims was caused by a GPI plugged into a basement outlet. Asserting various product liability claims under Maryland law, Redford brought suit against SC Johnson in the Circuit Court for Prince George's County. SC Johnson removed the case to this court. Discovery has been completed, and now pending before me is SC Johnson's motion for summary judgment. For the reasons that follow, the motion will be granted.

I.

Redford's home is located in Indian Head, Maryland. Residing there with her in the fall of 2001 were her two daughters and the daughters' father, Tyrone Butler ("Butler"). (*See* Redford Deposition at 50-52.) No one was at the home when the fire occurred in the early-morning hours of November 17. (*Id*.) Redford first learned of the fire while driving home later that morning from a hotel she had stayed at in Waldorf, Maryland the previous night. Mark Lewis, a family friend, had passed by the home and seen it in ruins, and had called her on her cell phone to break the news. (*Id*. at 58-59.) Upon arriving home, Redford saw for herself the destruction the fire had wrought. Many of her belongings were scattered across her lawn, her roof was almost entirely gone, and the inside of the home had been burnt severely, particularly on the left side. (*Id*. at 60-61.)

1

Later that day, Redford spoke with Linda Schubert ("Schubert"), a deputy in the Office of the Maryland State Fire Marshal who had accompanied the responding firemen to the home and had conducted a cause-and-origin investigation after the fire had been extinguished. (*Id*.) Schubert stated that the fire had begun in an electrical outlet located in a basement partition wall. (*Id*.) She said that she had seen an unidentifiable molten blob of plastic lying beneath the outlet, which Redford told her was probably the remnants of a GPI she had purchased a month-and-a-half earlier from WalMart and had plugged into the outlet. (*Id*. at 29; Schubert Deposition 39-40, Exhibit B to SC Johnson Reply Br.; *see* Redford Opposition Br. at 2 ("Redford Br.").) With that information, and having eliminated all other potential causes of the fire, Schubert concluded that the GPI must have overheated and ignited the combustible material within the basement wall. (Schubert Report at 2.) Another deputy visited the fire scene three days later and concurred with Schubert's findings. (*Id*.) Additionally, he observed several GPIs plugged into electrical outlets throughout the home, and brought one back to the Fire Marshal's office for inspection. (*See id*; Schubert Deposition at 43-44.) However, he was unable to collect the molten plastic blob as evidence because firemen had removed all debris from the home.

Redford had a homeowner's insurance policy with Nationwide Insurance Company ("Nationwide"). In response to her report of the fire, Nationwide hired Ward Caddington ("Caddington"), a fire investigation expert, to visit the home on November 20 and conduct an independent inquiry into the source of the fire. (Caddington Report at 1, Exhibit 4 to Redford Br.) Caddington agreed with the deputies that the point of origin was the basement outlet, and after examining the outlet he concluded that faulty wiring was not the culprit. He therefore concurred in the state deputies' assessment that the GPI must have caused the fire, though he was unable to specify how it had malfunctioned. (*Id*. at 1, 4.) He recommended that an electrical engineer be retained to survey the fire scene and conduct analyses of prototype GPIs in order to determine any

2

potential defects within the product. (*Id*. at 4.) Nationwide never followed up on this recommendation, but based on Caddington's findings it did deem the fire an incident covered by Redford's policy. Nationwide proceeded to pay for her home to be demolished and rebuilt. Over one year later, Redford filed the instant action. It was at this time that SC Johnson first learned of the fire.

II.

As a threshold matter, SC Johnson contends that Redford has not presented adequate evidence to show that she used any product it manufactured. Because none of the investigators saw remnants of a GPI in the basement outlet, Redford is the only person with personal knowledge of whether a GPI had been inserted in the outlet. Although ordinarily her assertion that she had inserted a GPI in the outlet itself would be entirely sufficient to create a genuine issue of fact, SC Johnson contends that her testimony has been so inconsistent on the question of what type of GPI had been inserted that the record establishes her inherent untrustworthiness. SC Johnson is certainly correct in arguing that Redford has contradicted herself on several different occasions. However, viewing the evidence most favorably to her (as, of course, I must do in considering SC Johnson's summary judgment motion), I cannot conclude that her testimony can be rejected as a matter of law.

By way of background, GPIs can be divided into two primary categories: gel-based and oil-based. Relevant to this case is the fact that SC Johnson also produces "extra outlet" versions of the gel-based and oil-based GPIs. These come with their own "plug-thru" outlet on the front of the unit so that consumers can use other electrical devices in the same wall outlet into which the GPI is plugged. For the sake of clarity I will refer to these four types of GPI as: standard gel-based; extra outlet gel-based; standard oil-based; and extra outlet oil-based. As of November 17, 2001, the date on which Redford's house caught fire, only the first three of these GPIs were available for purchase.

SC Johnson did not release the extra outlet oil-based GPI to retailers until December 2001, who, in turn, did not place them on sale until January 2002. Three months later, in April 2002, SC Johnson issued a recall for these units, stating that they "may have been misassembled during manufacture, which could pose a risk of fire." (Recall Notice, Exhibit 7 to Redford Br.) The company stated expressly that "[n]o other products, sold under the Glade PlugIns brand names, are part of the recall." (*Id.*)

Before bringing this suit, Redford stated repeatedly that the faulty GPI was a standard oil-based. (*See* Caddington Report at 3; Examination of Redford by Nationwide at 19-20, Exhibit E to SC Johnson Br.) Confirming these accounts, the GPI that the state deputy fire marshal took from one of the other outlets in Redford's home was also a standard oil-based. (*See* Schubert Deposition 43-44.) After the litigation began, however, the picture painted by Redford began to change.

On September 15, 2003, SC Johnson sent its expert electrical engineer, James Finneran ("Finneran"), to visit Redford at her home. Finneran claims that during the visit Redford told him that the GPI she had used was not oil-based, but instead was a standard gel-based in the shape of a seashell. (Finneran Affidavit ¶ 11, Exhibit D to SC Johnson Br.) Yet one month later on October 17, in response to an interrogatory question propounded by SC Johnson that asked her to name "any [defective GPI] product, including but not limited to the product allegedly involved in your incident," she replied as follows: "As set forth in Release No. 02-144 [which detailed the recall of the extra outlet oil-based GPIs], S.C. Johnson was the manufacturer of the 'Plug In' *purchased by Plaintiff* and 2.5 million customers." (Redford Interrogatory at 6, Exhibit G to SC Johnson Br. (emphasis added).) She then went on to quote the language from the recall notice about the risk of fire, and stated that she had specifically purchased the unit with the fragrance "Sky Breeze." (*Id.*)

Finally, six days later on October 23, Redford testified during her deposition that she had two types of GPI in her home at the time of the fire, both oil-based. (*See* Redford Deposition at 27

4

(describing the inserts for her GPIs at the time of the fire as "clear container[s] filled with liquid); *id*. at 28 (stating that at the time of the fire "the air fresheners in the home still had a little over a quarter liquid left").) Some were standard oil-based of the "sea shell-type kind [sic]," while the others were of the extra outlet variety. (*See id*. at 27.) While not entirely certain of which one was plugged into the basement outlet, she stated that she was "99 percent sure that it probably would have been a sea shell [sic], because there would be no need for a[n extra] plug there . . . ." (*Id*. at 35-36.) She then described the seashell GPIs as having an "off-white, cream-type color," but she did not remember any of the design features of the extra outlet GPIs. (*Id*. at 39.)

Despite her interrogatory answer and deposition testimony, Redford clearly did not have any extra outlet oil-based GPIs in November 2001, for they simply were not available for sale at that time. What remains, then, is the conflicting evidence concerning the seashell GPI, *i.e.* whether it was gel-based or oil-based. This distinction matters because SC Johnson stopped selling its seashell gel-based GPIs in 1997, yet Redford claims that she purchased the faulty GPI in October 2001. (SC Johnson Br. at 3-4.) And the standard oil-based GPIs were not available in a seashell design in November 2001 either. However, the oil *containers* do have a seashell design etched into their front that is visible when the container is inserted into the unit. It could very well be this etching that Redford was referring to in her deposition, which would also confirm her pre-litigation statements. Moreover, the standard oil-based GPIs are indeed an off-white/cream color.

For these reasons, I find that Redford has adequately established for the purposes of this motion that she did have a standard oil-based GPI plugged into her basement outlet on the night of the fire. Thus, I must examine whether she has carried her burden of proof with respect to the essential elements of her case.

III.

5

In deciding a motion for summary judgment, Rule 56(c) of the Federal Rules of Civil Procedure provides that the entry of summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir. 1994). Although Redford has asserted three different causes of action against SC Johnson—strict liability, negligence, and breach of warranty—they are all grounded in product liability, and under Maryland law, "regardless of the recovery theory, the plaintiff in product litigation must satisfy three basics from an evidentiary standpoint: 1) the existence of a defect; 2) the attribution of the defect to the seller; and 3) a causal relation between the defect and the injury." *Foster v. American Home Products Corp.*, 29 F.3d 165, 168 (4th Cir. 1991) (quoting *Jensen v. American Motors Corp.*, 437 A.2d 242, 247 (Md. Ct. Spec. App. 1981)). Even with all inferences drawn in her favor, Redford has not carried her burden of establishing the existence of a defect in the standard oil-based GPI. SC Johnson is therefore entitled to summary judgment.

Because firemen discarded the remains of the GPI, there is no direct evidence of what, if any, defect the GPI suffered from. Redford may, however, raise an inference of a defect through circumstantial evidence. *Harrison v. Bill Cairns Pontiac, Inc.*, 549 A.2d 385, 390 (Md. Ct. Spec. App. 1988) (stating that "[a]n inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration"); David G. Owen, *Manufacturing Defects*, 53 S.C. L. REV. 851, 874 (2002) ("Sometimes the specific cause of a malfunction disappears in the accident when the product blows up, burns up, is otherwise severely damaged, or is thereafter lost. . . . [W]here direct evidence is unavailable, the courts have properly refused to require the plaintiff to prove what specific defect caused the product to malfunction.").

Even absent direct evidence, however, a plaintiff's proof must still "arise above surmise, conjecture, or speculation" because her "right to recovery may not rest on any presumption from the happening of the accident." *Harrison*, 549 A.2d at 390 (internal quotations omitted). There are five factors the court must weigh in deciding whether she has overcome this hurdle: "(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect." *Id.* (quoting *Cornell Drilling Co. v. Ford Motor Co.*, 359 A.2d 822, 827 (Pa. Super. Ct. 1976), overruled on other grounds by *Rem Coal Co. v. Clark Equipment Co.*, 563 A.2d 128, 134 n.5 (Pa. Super. Ct. 1989)). "To the extent that a plaintiff's showing on one or more of these factors cuts against these conclusions, then the strength of the inference of a defect weakens and plaintiff risks the entry of summary judgment for defendant." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 408-09 (D. Md. 2001).

Redford has failed to satisfy the first, third, and fifth *Harrison* factors. Although she has satisfied the second and fourth, their combination is not enough to elevate Redford's proof above the impermissible presumption that the GPI was defective merely because a fire occurred. *Compare Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 389 (D. Md. 1993) (denying defendant's motion for summary judgment because three of the *Harrison* factors—the first, second, and fourth—favored plaintiff), *and Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC*, 2005 U.S. Dist. LEXIS 25275, *37 (D. Md. Oct. 27, 2005) (unpublished) (same), *with Gross v. Daimler Chrysler Corp.*, 2003 U.S. Dist. LEXIS 24673, at *14-15 (D. Md. Sept. 29, 2003) (unpublished) (granting defendant's motion for summary judgment because only one *Harrison* factor—the fourth—favored plaintiff).

A.  <u>Expert Testimony as to Possible Design or Manufacturing Defects</u>

Redford argues that the cause-and-origin analyses conducted by Schubert and Caddington suffice to satisfy the first *Harrison* factor because they both agree that a GPI had to have been the cause of the accident. The problem with this argument is that they arrived at this conclusion by eliminating other potential causes of the fire independent of the GPI *e.g.*, faulty outlet wiring, not by examining another standard oil-based GPI to determine possible manufacturing or design defects that could have caused the air freshener to overheat. Elimination of causes other than the alleged defective product is addressed by the fourth *Harrison* factor, however, not the first. Indeed, both experts admit that they are unqualified to testify as to possible defects, and refused to make any conjecture as to what might have malfunctioned within the GPI. (Caddington Deposition at 84, 90, Exhibit A to SC Johnson Br.; Schubert Deposition at 63-64, Exhibit B to SC Johnson Reply Br.) Consequently, the first factor weighs in favor of SC Johnson. *Compare Harrison*, 77 Md. App. at 51-52 (rejecting expert testimony concerning automobile fire because it indicated no specific problems with electrical system, but instead amounted only to a conclusion that "a fire would not normally result in the absence of a product defect"), *with Watson*, 816 F. Supp. at 387-88 (finding expert testimony of an electrical engineer as to possible design defect in electrical blanket—"inadequate protection where wires are connected to a terminal block"—satisfied the first *Harrison* factor).

### B. The Timing of the Accident

Redford has testified that she purchased the GPI a month-and-a-half prior to the fire. This proximity in time between the two events is more than enough for the second *Harrison* factor to weigh in her favor. *See e.g.*, *Watson*, 816 F. Supp. at 388 (finding ten months between purchase and accident sufficient for second factor to favor plaintiff); *Virgil v. "Kash N' Karry" Service Corp.*, 484 A.2d 652, 657 (Md. Ct. Spec. App. 1985) (finding three months sufficient).

C. <u>Similar Accidents Involving Similar Products</u>

Redford has submitted the following evidence in her effort to satisfy the third *Harrison* factor: an incident report log provided by SC Johnson to the U.S. Consumer Product Safety Commission ("CPSC") that documents sixty-four consumer descriptions of problems with GPIs between March 1, 2001 and March 1, 2002, most all of which have to do with overheating; and a CPSC press release announcing SC Johnson's 2002 recall of its extra outlet oil-based GPIs.

None of this evidence demonstrates that standard oil-based GPIs have overheated, however, but instead chronicles problems in other types of GPIs.[1] While such evidence can be relevant, to justify the comparison there first needs to be some showing that these products are similar in material aspects to the allegedly defective product. SC Johnson has submitted evidence that though all GPIs are plugged into electrical outlets and emit pleasant odors by heating a fragrant substance, their design and manufacturing characteristics are different. (*See* Finneran Affidavit ¶ 14; Mitchell Declaration ¶ 7, Exhibit C to SC Johnson Br.) Redford has provided no expert testimony to refute that contention. *See e.g.*, *Riley v. De'Longhi Corp.*, 2000 U.S. LEXIS 27082, at *10-12 (4th Cir. Oct. 30, 2000) (unpublished) (finding recall of an early model electrical heater relevant for the third *Harrison* factor even though the heater at issue was a later model because "there is expert testimony that the earlier heaters and the one here are sufficiently similar"). Absent such proof, I find that both the incident report log and the recall notice do not further an inference of a defect within the standard oil-based GPI, and that the third *Harrison* factor therefore favors SC Johnson.

---

[1] With respect to the incident report log, only thirteen of the sixty-four reports identify the type of GPI that malfunctioned, and each of these discuss only gel-based GPIs. As for the recall notice, SC Johnson recalled only the extra outlet oil-based GPIs, and did not take similar action with respect to the standard models. Thus, the malfunction was idiosyncratic to the extra outlet model, and is not indicative of any problems within all oil-based GPIs.

D. The Elimination of Other Causes

The cause-and-origin analyses of Schubert and Caddington pinpointed the origin of the fire to the basement outlet into which the GPI was allegedly plugged. As discussed above, both experts have eliminated all other causes independent of the GPI itself. Although SC Johnson never had an opportunity for its experts to examine the fire scene,[2] and it questions the thoroughness of Schubert's investigation, *see* SC Johnson Reply Br. at 4-5, Caddington's testimony, at a minimum, would provide a reasonable jury with enough to find in Redford's favor with respect to the fourth *Harrison* factor.

E. Type of Accident that Does Not Happen Without a Defect

Before applying the fifth *Harrison* factor, it is first necessary to revisit my opinion in *Watson*, in which I wrestled with the question of what the factor requires a plaintiff to show in order to prevail: "Does it mean that the accident is of a type that does not happen without a defect regardless of whether other causes are eliminated? Or does it mean that the accident is of a type that does not happen without a defect after other causes are eliminated?" 816 F. Supp. at 389; *see also Riley*, 2000 U.S. LEXIS 27082, at *13-14. I concluded that "[r]udimentary logic dictates that the

---

[2] SC Johnson argues that its ability to defend against this lawsuit has been severely compromised by Redford's spoliation of the fire scene, both because the remains of the alleged GPI were removed, and because there was no opportunity for a defense expert to determine whether the fire actually began at the basement outlet. "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citations omitted). Because of their duty "to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth," federal district courts have wide latitude in fashioning a sanction to redress prejudice created by a party's spoliation of evidence, though they must first find that the party acted with "some degree of fault." *Id*. While dismissal of a suit can sometimes be an appropriate sanction, *id*. at 593, SC Johnson has not asked that I exercise my discretion in this manner. Instead, it contends merely that Redford's failure to preserve evidence strengthens its case for summary judgment.

  I need not decide this issue, given that I am granting its motion on the basis of Redford's failure to raise an inference of a defect. I do note, though, that at least with regard to the remains of the GPI, there is no reason to infer that Redford's failure to act was motivated by a desire for the product to vanish. She was understandably distraught over the destruction of her home, and it would be asking a great deal to expect her to have gone rooting through the ashen remains of her basement so soon after the accident.

former meaning is the one intended," for if it were the latter, the factor "would have the effect of permitting a defect to be inferred from the occurrence of the accident in violation of the well established principle to the contrary." *Watson*, 816 F. Supp. at 389. In contrast, the former meaning "does add something to the test; the nature of the accident tends to confirm plaintiffs' elimination of other possible causes." *Id.* As applied to the facts of *Watson*, in which the plaintiffs alleged that a defective electric blanket caused a child's bed to catch fire, I found that the factor favored the defendant: "Accidents involving imploding bottles provide an example of . . . an accident" that does not occur without a defect. *Id.* "Obviously, however, fires can occur in beds over which an electric blanket is laying without there being any defect in the blanket." *Id*; *see also Stanley Martin*, 2005 U.S. Dist. LEXIS 25275, at *36-37 (finding that mold growth in wooden trusses can occur in the absence of a defect); *Gross*, 2003 U.S. Dist. LEXIS 24673, at *14 (finding that a fire in the engine compartment of an automobile can occur in the absence of a defect).

In light of *Watson*, the proper question in this case is not, as Redford suggests, whether a fire that starts within a GPI can occur in the absence of a defect. Rather, the question is whether a fire can occur in an electrical outlet into which a GPI is plugged in the absence of defect in the GPI. And the answer to the latter question is "yes," as faulty wiring in the outlet itself could certainly start a fire. Thus, the fifth factor cuts in favor of SC Johnson.

In sum, Redford has not presented sufficient circumstantial evidence to raise an inference of a defect. Without any expert testimony as to possible defects, evidence of overheating in other standard oil-based GPIs, or a showing that an electrical outlet into which a GPI is plugged cannot catch fire in the absence of a defect, a jury could only find in her favor by presuming that the GPI was defective merely because the fire occurred. Because such a presumption is prohibited under Maryland law, I must grant SC Johnson's motion for summary judgment.

A separate order effectuating this ruling is being entered herewith.


Date: <u>January 31, 2006</u>            /s/_____
                                         J. Frederick Motz
                                         United States District Judge